## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

TRANSAMERICA LIFE INSURANCE        Case No.: _____
COMPANY,

       PLAINTIFF,

v.

TRENT MURCH,

       DEFENDANT.

_____/

---

### COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF REQUESTED

---

Transamerica Life Insurance Company ("Transamerica"), files this complaint for declaratory judgment and damages against Trent Murch ("Murch") and, in support thereof, alleges as follows:

### PARTIES

1.    Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

2.    Murch is an adult individual residing, upon information and belief, in Naples, Florida and is a citizen of the State of Florida.

## JURISDICTION AND VENUE

3.     This is an action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, seeking declaratory relief and damages.

4.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.     Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(1) because the Middle District of Florida is the judicial district in which Murch resides.

## FACTS COMMON TO ALL COUNTS

6.     This is an action in which Transamerica alleges fraud against Murch in connection with a claim for benefits initiated by Murch under a long-term care insurance policy issued by Transamerica.

7.     Murch represented to Transamerica that he was entitled to receive long-term care insurance benefits due to certain functional and cognitive limitations he claimed to be experiencing, discussed herein.

8.     Murch deprived Transamerica of $132,049.66 of insurance benefits that should not have been paid.  He did this by knowingly and repeatedly misrepresenting material facts to Transamerica concerning a myriad of severe functional and cognitive limitations from which he claimed to suffer.  These misrepresentations

2

allowed Murch to trigger coverage under his long-term care insurance policy when, in fact, benefits could not and would not have been triggered based on Murch's true level of functionality and cognition.

9.      Transamerica performed multiple periods of surveillance on Murch and Murch's wife/alleged caregiver, Kelly Murch, over the course of a two year investigation.  Murch displayed a level of functionality and cognition that was both irreconcilable with his representations to Transamerica concerning the same and detached from the notion that he met the eligibility triggers for long-term care insurance benefits.

10.     Moreover, despite regularly seeing Murch and his wife active in the community together, Transamerica never once observed Ms. Murch providing assistance to Murch despite Murch's reported need for nearly round-the-clock care to perform even the most basic tasks and movements, such as getting in or out of a chair.

A. **Murch's Policy with Transamerica**

11.     On or about October 1, 2011, Transamerica issued long-term care insurance policy no. 031098818 to Murch (the "Policy").  A true and correct copy of the Policy (excluding the application, which contains Protected Health Information under the HIPAA statute) is attached hereto as **Exhibit A**.

12.    The Policy is an Illinois contract.  It was applied for, issued and delivered in the State of Illinois in accordance with Illinois law and regulations during a time period when Murch was a Citizen of the State of Illinois.

13.    In order to be eligible to receive benefits under the Policy, Murch must require **Qualified Long-Term Care Services** because he is a **Chronically Ill Individual**.

14.    **Qualified Long-Term Care Services** means "[n]ecessary diagnostic, preventive, therapeutic, curing, treating, mitigating, and rehabilitative services …."

15.    **Chronically Ill Individual** means a person who is "unable to perform, without **Substantial Assistance** from another individual, at least 2 out of the 6 **Activities of Daily Living (ADLs)** for an expected period of at least 90 days due to a loss of functional capacity; or … requiring **Substantial Supervision** to protect You from threats to health and safety due to **Severe Cognitive Impairment**."

16.    **Substantial Assistance** means Hands-On Assistance or Standby Assistance from another person.

17.    The six ADLs defined in the Policy include Bathing, Continence, Dressing, Eating, Toileting and Transferring.

18.    **Substantial Supervision** means "Continual supervision by another person that is necessary to protect You as a Severely Cognitively Impaired person from threats to Your health or safety (such as may result from wandering).  This

4

includes cuing by verbal prompting, gestures, or other demonstrations.  Supervision

that is intermittent or periodic is not considered Substantial Supervision."

    19.   **Severe Cognitive Impairment** means:

A severe loss or deterioration in intellectual capacity that is measured
by clinical evidence and standardized tests as part of an evaluation that
reliably measures impairment in Your:
(1) short-term or long term memory;
(2) orientation as to people, places or time;
(3) deductive or abstract reasoning; and
(4) judgment as it relates to safety awareness

The evaluation shall include utilizing cognitive tests with resulting
scores consistent with a diagnosis of Severe Cognitive Impairment.

    20.   When this language is boiled down, there were two ways in which

Murch could potentially have triggered benefits under the Policy: (1) He required

and received Hands-On or Standby Assistance from another person due to an

inability to perform two or more ADLs for a period expected to last at least 90 days;

or (2) He required and received Substantial Supervision from another person to

protect him from threats to health or safety due to the presence of an objectively

demonstrable Severe Cognitive Impairment.

    21.   As with substantially all insurance policies, Murch was required to pay

premium in order for the Policy to remain in-force.  If Murch failed to pay premium

timely, his Policy would lapse and terminate.

    22.   Murch's Policy, however, included a "Waiver of Premium Rider – Cash

Benefit" ("Rider").  In accordance with this Rider, Murch's premium obligation

5

would be waived during the pendency of a legitimate claim for cash benefits. In other words, Murch was not required to pay premium during the pendency of a legitimate claim.

**B. Murch's First Claim Under the Policy**

23.    On or about March 17, 2016, Murch opened an initial claim, No. 0210160317035 (the "First Claim"), for benefits under the Policy.

24.    Murch initiated the First Claim in Illinois during a time period when Murch was a Citizen of the State of Illinois.

25.    The First Claim related to an alleged inability by Murch to perform ADLs without Substantial Assistance due to a number of medical conditions from which Murch claimed to suffer. Notably all of these conditions were subjective in nature and of non-specific origin, meaning there was no objectively-identifiable basis for Murch's claimed functional limitations.

26.    On or about March 30, 2016, Murch underwent an initial onsite assessment at his home in Illinois.

27.    An "onsite assessment" or simply "assessment" is a term commonly used to describe an in-person examination during which a licensed health care practitioner, such as a nurse or medical social worker, personally examines a long-term care insurance claimant in order to help the insurer determine whether the claimant is eligible to receive benefits.

28.     Onsite assessments are performed by an independent assessor (not a Transamerica employee) with no prior connection to the claimant, and typically occur in the insured's home.

29.     Under federal law, claimants must be reassessed at least once annually if they hold a federally tax qualified policy.

30.     Murch's Policy is federally tax qualified, meaning he needed to be reassessed at least once annually in order to become, and later remain, eligible to receive benefits.

31.     In addition to annual reassessments in the home, Murch also underwent periodic telephonic reassessments, typically at or near the six month mark between annual assessments in the home.

32.     All telephonic reassessments were performed in the State of Illinois during a time period when Murch was a citizen of the State of Illinois.

33.     During the initial March 30, 2016 in-home assessment, Murch reported to the assessor that he was unable to perform five of six ADLs without Hands-On Assistance from another person, indicating an ostensibly severe level of functional limitation and complete dependence on a caregiver.  In particular, he reported that he experienced frequent falls and severe pain of non-specific origin.  He also reported that he was dependent on a caregiver for tasks like meal preparation and grocery shopping.

34.     Based on these and other representations by Murch to the nurse-assessor during the initial onsite assessment, Transamerica approved Murch's claim under the Policy and began paying benefits.

35.     When Murch's First Claim was approved, he elected to receive the Policy's cash benefit, meaning the Policy would pay him a benefit of between $4,870.00 and $5,110.00 each month he continued to meet the Policy's benefit eligibility triggers.

36.     All benefits were paid to Murch in Illinois during a time period when Murch was a Citizen of the State of Illinois.

37.     Prior to being paid benefits each month, Murch was required to sign and submit a form to Transamerica acknowledging that he was receiving the cash benefit for that month in accordance with the Policy.  By implication, every such form was a representation by Murch that he was eligible to continue receiving benefits because, as Murch knew, benefits could not be paid unless he continued to meet the Policy's benefit eligibility triggers and submitted the form.

38.     Every such form contained an acknowledgment by Murch that stated: "Any person who knowingly and with intent to injure, defraud or deceive any insurance company files a statement of claim containing false, incomplete or misleading information is subject to criminal and/or civil penalties."

39.     Murch did, in fact, sign and submit a form in support of his First Claim each and every month, without which benefits under the Policy would not have been paid.

40.     Every such form was signed and submitted by Murch in Illinois during a time period when Murch was a Citizen of the State of Illinois.

41.     Moreover, when Murch's First Claim was approved, the Rider was triggered and Murch's premium obligation was waived.  Accordingly, Murch paid no premium for the Policy during the pendency of the First Claim.

42.     The Rider was triggered, and premium was waived, in Illinois during a time period when Murch was a Citizen of the State of Illinois.

43.     As discussed, Murch was required by federal law to undergo a reassessment for benefits at least once annually.  Accordingly, Murch underwent annual reassessments with an independent nurse-assessor in 2016 and 2017.

44.     All 2016 and 2017 reassessments took place in Illinois during a time period when Murch was a citizen of the State of Illinois.

45.     During the initial onsite assessment, all in-home reassessments and all telephonic reassessments described above, Murch represented to Transamerica that he was unable to perform at least two ADLs without Substantial Assistance.

46.     Moreover, during at least four of these evaluations, Murch represented that he was unable to perform four or five of six ADLs without Substantial

Assistance, signaling an ostensibly severe level of functional limitation and complete dependence on a caregiver.

47.    Meanwhile, Murch's list of reported medical issues continued to evolve over time.    He reported an essential tremor which, he claimed, was severe and prevented him from using his hands for things like fastening buttons or holding a glass of water.    He also began reporting hallucinations, extreme (10/10) pain of a non-specific origin, and an unsteady gait with frequent falls on top of worsening fatigue.    He reported that he could not walk from room to room in his home without bracing himself against the walls or furniture, and advised independent nurse-assessors that he required Hands-On Assistance even to get in or out of a chair.    He reported that his wife provided him with nearly round-the-clock care.

48.    Based on these and a litany of similar representations, Transamerica continued to pay benefits under the Policy during the 2016-17 time period.    All such benefits were paid to Murch in Illinois during a time period when Murch was a Citizen of the State of Illinois.

49.    In lieu of an in-home reassessment in 2018, Transamerica scheduled Murch for an independent medical evaluation ("First IME") with Dr. Nicholas Schlageter, in accordance with Transamerica's rights under the Policy.    Dr. Schlageter is a board certified neurologist who had no prior connection to Transamerica or Murch.

10

50.    The First IME took place in Illinois on or about February 20, 2018 during a time period when Murch was a citizen of the State of Illinois.  Curiously, Murch drove himself to the appointment alone.  No caregiver was present.

51.    Notwithstanding Murch's representation during the First IME that he was unable to perform ADLs and was experiencing novel "cognitive issues," Dr. Schlageter concluded that Murch was able to perform all ADLs without assistance and did not suffer from a Severe Cognitive Impairment.  In other words, Dr. Schlageter concluded that Murch did not meet the requirements to receive benefits under the Policy.

52.    Transamerica denied Murch's First Claim effective April 17, 2018 in accordance with the terms and conditions of the Policy because Murch did not meet the Policy's benefit triggers.

53.    The claim denial occurred and was communicated in Illinois during a time period when Murch was a Citizen of the Stat of Illinois.

54.    Transamerica paid a total of $132,049.66 in benefits under the First Claim.  As stated, all benefits were paid in Illinois during a time period when Murch was a Citizen of the State of Illinois.

### C. **Murch's Second Claim Under the Policy**

55.     On or about January 28, 2019, Murch contacted Transamerica to open a new claim (No. 20190128020) under the Policy (the "Second Claim," together with the First Claim, the "Claims").

56.     Murch initiated the Second Claim from Illinois during a time period when he was a Citizen of the State of Illinois.

57.     During a February 12, 2019 in-home assessment with an independent nurse-assessor in support of the Second Claim, Murch represented that he was unable to perform five of six ADLs without Substantial Assistance, indicating an ostensibly severe level of functional limitation.

58.     Murch also represented that he required Hands-On Assistance for Mobility both inside and outside the home.  And he claimed to have experienced nearly 30 falls in the preceding six months.  In other words, Murch sought to give the impression that his functionality had declined markedly since the denial of his First Claim.

59.     The February 12, 2019 in-home assessment and all representations by Murch in regard to the same took place in Illinois during a time period when Murch was a Citizen of the State of Illinois.

60.     Transamerica gathered additional medical records in connection with the Second Claim.  Based on those medical records, viewed in context of the

preliminary information Transamerica began gathering during its claim investigation (discussed below), Transamerica declined to approve benefits for the Second Claim on or about July 17, 2019.

61.    Shortly thereafter, and without initiating a claim appeal, Murch sought to overturn Transamerica's decision on the Second Claim.

62.    In particular, Murch persisted in the notion that he was unable to perform five of six ADLs.  And, notwithstanding that he underwent objective cognitive screening during all prior in-home assessments and scored well within the normal range on all of those tests, Murch sought to hybridize the claim by suggesting that, in addition to ADL limitations, he suffered from a Severe Cognitive Impairment that caused him to require Substantial Supervision from a caregiver in accordance with the Policy's cognitive benefit trigger.

63.    Due to the novel suggestion that Murch suffered from a Severe Cognitive Impairment, Transamerica scheduled Murch for a second independent medical evaluation ("Second IME") in October 2019.

64.    The Second IME was performed by Dr. Christopher Pasquale, an independent board certified psychiatrist who had no prior relationship with Transamerica or Murch.

65.    The Second IME was performed in Illinois during a time period when Murch was a Citizen of the State of Illinois.

66.    Dr. Pasquale concluded that Murch did not suffer from a Severe Cognitive Impairment.

67.    Murch underwent a final in-home assessment with an independent assessor in February 2020.  During the final assessment, Murch reported that he was unable to perform all six of six ADLs without Substantial Assistance, among a litany of other representations calculated to give Transamerica the impression that he was experiencing severe functional limitations and was completely dependent on nearly round-the-clock care from a caregiver.

68.    The February 2020 in-home assessment was performed in Illinois during a time period when Murch was a Citizen of the State of Illinois.

**D. Transamerica's Investigation of Murch's Claims**

69.    Notwithstanding Murch's representations over the life of both Claims that he suffered from severe ADL limitations (or, later, a Severe Cognitive Impairment) and was completely dependent on a caregiver, Transamerica began observing information during the pendency of the Claims that seemed inconsistent with the notion that Murch suffered from a legitimate inability to perform ADLs or a Severe Cognitive Impairment.

70.    Medical records from Murch's doctors consistently recorded his functional status as "independent."  In fact, there were multiple references to medical

advice Murch received to get more exercise, including discussion that he planned to buy a treadmill.

71.    Murch underwent comprehensive neurological examinations and imaging, all of which came back completely normal. Indeed, there did not ever appear to be any objectively identifiable basis for Murch's alleged ADL or cognitive limitations.

72.    And Murch continued to drive a car despite reporting that he could not get in or out of a chair without Hands-On Assistance from another person and suffered from episodes of hallucinations and narcolepsy. In fact, Murch not only drove a car, but routinely drove with his young children in the car with him.

73.    Murch also began scheduling doctor appointments close in proximity to his annual in-home reassessments – an overt effort by Murch to generate medical records from his own providers, which he believed would favor benefit eligibility in the event he was determined to be ineligible for benefits following an annual reassessment.

74.    Based on these and other inconsistencies with Murch's Claims, Transamerica determined that an investigation, including surveillance, was necessary and appropriate.

75.    Transamerica undertook multiple periods of surveillance over the course of nearly two years in order to develop the fullest possible understanding of Murch's true functionality and the veracity of his claim.

76.    The entirety of the investigation, including all surveillance, took place in Illinois during time periods when Murch was a citizen of the State of Illinois.

77.    The surveillance showed a level of functionality detached from Murch's representations to Transamerica and the notion that he suffered from an ADL limitation or Severe Cognitive Impairment.  Indeed, he consistently performed movements and tasks directly analogous to the performance of all ADLs and displayed a level of independence unbefitting an individual that was functionally limited or severely cognitively impaired.

78.    By way of example, Murch appeared to have no gait issues, nor issues reaching or bending.

79.    Fatigue never appeared to be a factor.  Murch never stumbled or fell.

80.    Murch never appeared to be in physical discomfort of any kind, let alone 10/10 pain.

81.    Murch drove a car regularly, including with his young children as passengers.

82.    Murch used his hands with a high level of precision and dexterity; no tremor was ever observed.

16

83.    Murch carried large and heavy objects (including his children) with no corresponding effect on balance, strength or gait.

84.    Murch shopped in stores.  He did so alone.

85.    Murch bent over to his toes, as one might do in the shower.

86.    Murch visited a recreational vehicle convention for a lengthy period of time.

87.    Murch went out to dinner with his wife.

88.    Murch was alone for hours at a time despite claiming an inability to get in and out of a chair or go to the bathroom without Hands-On Assistance from his wife.

89.    Notably, Murch's wife/caregiver was never once seen providing assistance of any kind despite Murch's claim that he struggled even to walk without her being within arm's reach and that he required Hands-On Assistance at all times outside the home.

90.    Transamerica's observations of Murch remained consistent over time, meaning there was not any indication that Murch met the benefit triggers of his Policy.  He consistently functioned at a high level that clearly was not commensurate with his representations to Transamerica or the notion that he met the Policy's benefit triggers.

91.     Transamerica also performed multiple periods of surveillance on Ms. Murch.   This surveillance confirmed that Murch was often alone for protracted periods of time.   The fact that Murch was often alone is inconsistent with the notion that he needed or received nearly continuous care from his wife, as represented to Transamerica.

92.     All surveillance on Ms. Murch was performed in Illinois during a time period when Murch and Ms. Murch were Citizens of the State of Illinois.

### E. Confirmation of Fraud with Nurse-Assessor

93.     Due to the significant disconnect between Murch's reported limitations and Transamerica's observations on video, Transamerica contacted the independent nurse-assessor who performed the February 2019 and February 2020 in-home reassessments in support of the Second Claim because she had personal knowledge of Murch's Claims and supposed ADL limitations.

94.     Transamerica asked this nurse-assessor to review surveillance taken close in time to in-home assessments she performed.   Transamerica asked whether those videos changed her opinion in regard to Murch's ADL limitations based on what she had personally observed in his home.

95.     The nurse-assessor recalled Murch well, including the in-home assessments she had performed.

96.     She reported that the videos changed her opinion completely.

18

97.    Indeed, she concluded that Murch was not only able to perform all of his ADLs without assistance of any kind, but that there was no reasonable way, medically speaking, to reconcile her observations from the video with her observations of Murch in the home.  She clearly and unequivocally concluded that Murch misrepresented his functionality during reassessments she performed in order to obtain benefits under the Policy.  She also concluded that he did not suffer from a Severe Cognitive Impairment.

98.    The nurse-assessor provided Transamerica with two signed, notarized affidavits taken under oath and under penalty of perjury in which she discussed in detail her personal observations of Murch against the video.  The affidavits were signed and notarized in the State of Illinois.

99.    Based on the surveillance video and the sworn testimony of the nurse-assessor, a licensed health care practitioner with firsthand knowledge of Murch's supposed physical and cognitive limitations, Transamerica closed its investigation and determined that Murch had, in fact, engaged in claim fraud against Transamerica.

100.    Transamerica paid a total of $132,049.66 in benefits under the Policy. Those benefits were obtained by fraud and concealment, and are subject to recovery in this lawsuit.

101.    Murch's conduct was protracted and egregious, and was of such a nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

102.    Moreover, Transamerica is entitled to a declaration that the Policy is void under the inherent power of the Court to adjust the equities between the parties due to (a) Murch's breach of the implied covenant of good faith and fair dealing between the parties; and (b) as a means of compensating Transamerica for a portion of its losses.

103.    Transamerica is also entitled to a declaration that the Policy constructively lapsed and terminated in 2016 due to Murch fraudulently triggering the Policy's waiver of premium Rider and, as a result, paying no premium during the pendency of the First Claim.

104.    Accordingly, there is an actual and presently-justiciable controversy between the parties for which there is no adequate remedy at law concerning the question of whether the Policy is void and/or constructively lapsed and terminated.

105.    Upon information and belief, Murch and his family moved from Illinois to Florida in or around February 2021.

106.    Upon information and belief, Murch's move to Florida took place after the transactions and occurrences giving rise to Transamerica's causes of action against Murch took place.

107.    In other words, upon information and belief, Murch was a Citizen of Illinois during all or substantially all time periods germane to this Complaint.

## COUNT I – FRAUD

108.    Transamerica incorporates and realleges the allegations in Paragraphs 1 through 107 as though set forth fully herein.

109.    Murch did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Transamerica as described in this Complaint, in the following ways:

   a. Creating and perpetuating the false impression that he suffered from an inability to perform two or more ADLs without Hands-On or Standby Assistance from another person when, in fact, he did not;

   b. Creating and perpetuating the false impression that he suffered from a Severe Cognitive Impairment for which he required Substantial Supervision when, in fact, he did not;

   c. Creating and perpetuating the false impression that Ms. Murch provided care to Murch nearly round-the-clock when, in fact, such care was not needed or provided;

d. Submitting monthly claim forms to Transamerica in which he continued to claim entitlement to his Policy's cash benefit when, in fact, he was not entitled to receive this or any other benefit;

e. Creating and perpetuating the false impression that his care needs, if any, were greater than they were in-fact; and

f. Creating and perpetuating the false impression that Ms. Murch provided him with specific kinds of care services when, in fact, she did not do so.

110. Upon information and belief, Murch made and perpetuated these misrepresentations repeatedly over a continuous period of nearly five years, from 2016 to present, with knowledge of their falsity.

111. Murch made and perpetuated these misrepresentations to Transamerica with intent that the false information would be relied upon by Transamerica for his benefit and to Transamerica's detriment.

112. Transamerica did, in fact, rely on Murch's misrepresentations by paying benefits to Murch that Murch was not lawfully entitled to receive.

113. Prior to undertaking, completing and closing its claim investigation, Transamerica was unaware of the falsity of Murch's representations and was therefore justified in relying on the representations when it paid benefits.

114. As a direct and proximate result of Murch's fraudulent misrepresentations, Transamerica paid benefits of $132,049.66.

115. Transamerica incurred additional losses in an amount to be determined at trial relating to the cost of investigating the Claims.

## <u>COUNT II – NEGLIGENT MISREPRESENTATION</u>

116. Transamerica incorporates and realleges the allegations in Paragraphs 1 through 107 as though set forth fully herein.

117. Murch had both a contractual and legal duty to provide true and correct information to Transamerica in regard to the Claims he submitted under the Policy.

118. Notwithstanding the existence of this duty, Murch provided false information to Transamerica in the following ways:

    a. Creating and perpetuating the false impression that he suffered from an inability to perform two or more ADLs without Hands-On or Standby Assistance from another person when, in fact, he did not;

    b. Creating and perpetuating the false impression that he suffered from a Severe Cognitive Impairment for which he required Substantial Supervision when, in fact, he did not;

c.  Creating and perpetuating the false impression that Ms. Murch provided care to Murch nearly round-the-clock when, in fact, such care was not needed or provided;

d.  Submitting monthly claim forms to Transamerica in which he continued to claim entitlement to his Policy's cash benefit when, in fact, he was not entitled to receive this or any other benefit;

e.  Creating and perpetuating the false impression that his care needs were greater than they were in-fact; and

f.  Creating and perpetuating the false impression that Ms. Murch provided him with specific kinds of care services when, in fact, she did not do so.

119.  Upon information and belief, Murch made and perpetuated these misrepresentations repeatedly over a continuous period of nearly five years, from 2016 to present.

120.  Murch provided all such false information with intent that the false information would be relied on by Transamerica and he would be paid benefits under the Policy.

121.  Transamerica did, in fact, rely on Murch's misrepresentations by paying benefits to Murch that Murch was not lawfully entitled to receive.

122.    Prior to undertaking, completing and closing its claim investigation, Transamerica was unaware of the falsity of Murch's representations and was therefore justified in relying on the representations when it paid benefits.

123.    As a direct and proximate result of Murch's false representations, Transamerica paid benefits of $132,049.66.

## <u>COUNT III – RESTITUTION OF BENEFITS PAID</u>

124.    Transamerica incorporates and realleges the allegations in Paragraphs 1 through 107 as though stated fully herein.

125.    Transamerica has no present obligation to pay benefits under the Policy due to one or both of: (1) Murch's lack of a qualifying ADL deficiency; and (2) Murch's need for Substantial Assistance due to the presence or a Severe Cognitive Impairment.

126.    Transamerica had no obligation to pay benefits under the Policy during some or all of the period of Murch's Claims due to one or both of: (1) Murch's lack of a qualifying ADL deficiency; and (2) Murch's need for Substantial Assistance due to the presence or a Severe Cognitive Impairment.

127.    Because Transamerica has made an overpayment of benefits, Transamerica is entitled to restitution in an amount to be determined at trial.

## COUNT IV – DECLARATION THAT THE POLICY IS VOID

128. Transamerica incorporates and realleges the allegations in Paragraphs 1 through 107 as though set forth fully herein.

129. Insurance contracts are agreements *uberrimae fidei* and are imbued with a mutual implied covenant of good faith and fair dealing.

130. By initiating and perpetuating a protracted fraud against Transamerica, Murch has breached the implied covenant and demonstrated that he is incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica.

131. Accordingly, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policy void so Transamerica is not faced with a future threat of fraudulent claims.

132. It is also necessary and appropriate for the Court to declare the Policy void as a means of compensating Transamerica for a portion of the losses attributable to Murch's fraudulent conduct.

133. Moreover, Transamerica is entitled to a declaration that the Policy constructively lapsed and terminated in or around 2016.

134. By initiating and perpetuating a fraudulent claim, Murch also caused the waiver of premium Rider of his Policy to be fraudulently triggered. Accordingly, Murch paid no premium for the Policy during the pendency of the First Claim.

135.    But for Murch fraudulently triggering the Rider, his Policy would have lapsed and terminated for non-payment of premium in 2016.

136.    Murch is estopped to claim the benefit and/or protections of the Rider in order to aver that the Policy remained in-force beyond the termination of the First Claim because he triggered the Rider fraudulently and Transamerica was unaware of the same until Transamerica completed and closed its fraud investigation.

137.    There is, therefore, an actual, present and justiciable controversy between the parties as to whether the Policy is void and/or lapsed and terminated.

WHEREFORE, Transamerica respectfully demands the following relief:

1.    Actual and compensatory damages in an amount to be determined at trial, plus interest;

2.    Punitive damages;

3.    Attorney's fees;

4.    The costs of litigation;

5.    A judicial declaration that the Policy is void or, in the alternative, that the Policy constructively lapsed and terminated;

6.    A judicial declaration that Transamerica may retain some or all of the premium paid for the Policy;

7.    Restitution of benefits paid under the Policy in an amount be determined by the Court;

8.    Such other relief as may be demonstrated at trial; and

9.    Such other relief as the Court deems just and proper.

Dated:        February 24, 2021

Respectfully submitted,

**COZEN O'CONNOR**

By:   /s Chad A. Pasternack
          Chad A. Pasternack
          Florida Bar No. 117885
          cpasternack@cozen.com
          One North Clematis Street, Suite 510
          West Palm Beach, Florida  33401
          Telephone:  (561) 515-5250
          Facsimile:  (561) 515-5230

**Of Counsel:**
Michael D. Rafalko, Esquire (To be
admitted *Pro Hac Vice*) (Lead
Counsel)
Allison Bressler Goldis, Esquire (To
be admitted *Pro Hac Vice*)
mrafalko@cozen.com/
agoldis@cozen.com
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA  19103
Telephone:  (215) 665-4611
                    (215) 665 7241
Fax:            (215) 665-2013

*Attorneys for Plaintiff Transamerica
Life Insurance Company*

28